33 F.3d 1232
 UNITED WORLD TRADE, INC., Plaintiff-Appellant,
v.
MANGYSHLAKNEFT OIL PRODUCTION ASSOCIATION, Kazakhstan
Commerce Foreign Economic Association, and
Ministry of Energy and Fuel Resources of
the Republic of Kazakhstan,
Defendants-Appellees.
 No. 93-1193.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 29, 1994.
 
 1
 Phillip D. Barber (Terry Jo Epstein with him on the brief), of Dufford & Brown, P.C., Denver, CO, for plaintiff-appellant.
 
 
 2
 Gordon G. Greiner (Davis O. O'Connor and Steven A. Bain with him on the brief), of Holland & Hart, Denver, CO, for defendants-appellees.
 
 
 3
 Before BRORBY and McWILLIAMS, Circuit Judges, and BROWN,* District Judge.
 
 
 4
 WESLEY E. BROWN, District Judge.
 
 
 5
 The issue in this case is whether the defendants are immune from the jurisdiction of the U.S. District Court under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. Sec. 1602 et seq. The district court held that the defendants were entitled to immunity and dismissed the complaint. 821 F.Supp. 1405.
 
 
 6
 Under the FSIA, foreign states are generally immune from the jurisdiction of the courts of the United States. 28 U.S.C. Sec. 1604. (It is undisputed that the defendants are "foreign states" within the meaning of the FSIA.) One exception to this general rule is found in Sec. 1605(a)(2), which provides in part that a foreign state shall not be immune from jurisdiction in cases in which the action is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." Id.
 
 
 7
 The claims in this case arose out of an overseas oil transaction. The district court determined that the alleged actions of the defendants in connection with the transaction did not have a direct effect in the United States. Accordingly, the court found that the exception set forth in Sec. 1605(a)(2) had not been satisfied and concluded that it lacked jurisdiction. Plaintiff challenges this finding. For the reasons expressed herein, we conclude that the district court did not err in dismissing the complaint.[1]
 
 I.
 
 8
 Because this case comes to us on review of a motion to dismiss the complaint, we assume that the allegations in the complaint are true. Saudi Arabia v. Nelson, 507 U.S. ----, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). We note that, in keeping with the sound practice of resolving claims of immunity at the earliest possible stage of the case, the parties submitted affidavits and other materials outside the complaint to aid in the district court's determination of this issue. Cf. Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 449 (D.C.Cir.1990). The complaint and the various materials submitted to the court disclose the following pertinent facts.
 
 
 9
 The plaintiff United World Trade, Inc. ("UWT"), is a corporation organized under the laws of Colorado with its principal place of business in Denver, Colorado. Defendant Mangyshlakneft Oil Production Association ("MOP") is an enterprise under the laws of the Republic of Kazakhstan and has authority to conduct oil production and export oil on behalf of the Republic.[2] The Kazakhstan Commerce Foreign Economic Association ("Kazcom") is an entity under the laws of Kazakhstan and acted as an agent for MOP in the transactions at issue in this case. The Ministry of Energy and Fuel Resources of Kazakhstan Republic is a ministry of the Kazakhstan government.
 
 
 10
 The plaintiff UWT entered into a "Protocol Agreement" with Kazcom and other parties on July 25, 1991, in Alma-Ata, Kazakhstan. In this document the parties expressed their interest in establishing a long-term relationship to refine and export raw materials, including crude oil, from Kazakhstan. Further negotiations were held in face-to-face meetings in Moscow and Alma-Ata. UWT also alleges that the defendants communicated with UWT in Denver via U.S. Mail, telephone and fax machines, but UWT has not identified the substance of any such communications.
 
 
 11
 On December 17, 1991, representatives of UWT and defendants MOP and Kazcom met in Moscow and entered into a "Preliminary Agreement," which was "to serve as an umbrella for other contracts." In the Preliminary Agreement, UWT stated that it would provide a selection of potential buyers for Kazakhstan's "Buzachi" oil of up to one million metric tons per year and sell up to 200,000 metric tons of oil during the first quarter of 1992. Defendant MOP promised to hold negotiations with UWT and its prospective buyers, to provide up to 200,000 metric tons of oil in the first quarter of 1992 if a qualified buyer was found by UWT, and to provide an additional 800,000 metric tons of oil during the remainder of 1992. MOP promised that it would not circumvent UWT and deal directly with anyone UWT identified as a potential customer.
 
 
 12
 UWT successfully completed its obligation to present a refinery specializing in "Buzachi" oil that was acceptable to the defendants--namely, an Italian company in Sicily called "ISAB." On January 23, 1992, UWT, MOP and Kazcom entered into an agreement in Moscow entitled "Contract for Sale of Crude Oil." Under the contract, MOP as the seller was required to supply UWT with 200,000 metric tons of oil during January, February and March, 1992. UWT was to pay MOP 97% of the price paid by UWT's customer, ISAB. The method of payment to MOP was set forth in the contract:
 
 
 13
 In U.S. Dollars by irrevocable documentary credit opened by a first class European/USA bank and notified through advising bank, with payment for seller's account at thirty (30) calendar days from B/L date against presentation of commercial invoice and other usual shipping documents at bank counters. Letter of credit to be opened before loading.
 
 
 14
 Latest day for documents/LOI presentation 10.00 hrs A.M. Italian time of three (3) working days prior to payment date, otherwise payment will be effected three (3) working days after the presentation of documents/LOI.
 
 
 15
 * * * * * *
 
 
 16
 Payment falling due on Sunday or Monday banking holiday in New York shall be made on the first following banking day. Payment falling due on Saturday or any other banking holiday in New York shall be made on the preceding banking day.
 
 
 17
 All bank commissions and sundry charges outside buyer's bank are for seller's account.
 
 
 18
 Pursuant to the contract, MOP transported 200,000 metric tons of oil from inside Kazakhstan to Novorossyisk on the Black Sea. The oil was then to be shipped in four tanker shipments to ISAB's refinery in Sicily. Before each delivery, the London Branch of the San Paolo Bank--the bank selected by UWT pursuant to the contract--issued a letter of credit sufficient to cover payment in favor of MOP and notified MOP in Alma-Ata. Upon notification, MOP shipped the oil. After delivery to ISAB, MOP sent the shipping documents to the London Branch of the San Paolo Bank, which made payment in favor of MOP to MOP's account with Credit Commercial de France bank in Paris.
 
 
 19
 The first two shipments of oil went smoothly. The bill of lading for the third shipment was apparently stolen from a Kazcom representative. The missing bill of lading created potential liability for ISAB, the ultimate buyer of the oil, and ISAB initially refused to release payment to UWT for the third shipment. UWT contends that it ultimately secured release of payment from ISAB by issuing a guaranty to indemnify ISAB against third party claims. According to UWT, the defendants refused after the third shipment to supply any additional oil to UWT and began selling oil directly to ISAB. UWT then filed this action in the U.S. District Court for the District of Colorado, asserting four claims: breach of contract, anticipatory repudiation of the contract, fraud and misrepresentation, and consequential damages.
 
 II.
 
 20
 The Foreign Sovereign Immunities Act "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443, 109 S.Ct. 683, 693, 102 L.Ed.2d 818 (1989). "Under the Act, a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject matter jurisdiction over a claim against a foreign state." Saudi Arabia v. Nelson, 507 U.S. ----, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). The exception relied upon by the plaintiff in this case provides that a foreign state is not immune from suit in any case "in which the action is based ... upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." Sec. 1605(a)(2). The only disputed issue here is whether the defendants' actions caused a "direct effect" in the United States.
 
 
 21
 The "direct effect" exception was addressed by the Supreme Court in Republic of Argentina v. Weltover, --- U.S. ----, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). In Weltover, the plaintiffs were holders of certain Argentinean bonds. The bonds called for Argentina to make payment of principal and interest to bondholders in U.S. dollars. Payment could be made through transfer on the London, Frankfurt, Zurich or New York market, at the election of the creditor. When the bonds began to mature, Argentina unilaterally extended the time for payment and offered bondholders substitute instruments. The plaintiffs, two Panamanian corporations and a Swiss bank, refused to accept the rescheduling and insisted on full payment, specifying New York as the place where payment should be made. The plaintiffs then brought suit in the U.S. District Court, alleging that Argentina's failure to pay the bonds according to the original terms was a breach of contract. Jurisdiction was alleged under Sec. 1605(a)(2) of the FSIA. The plaintiffs argued that Argentina's refusal to make payment caused a "direct effect" in the U.S. because payment that was supposed to have been made in New York was not made. The Supreme Court agreed. The Court rejected an argument that an effect could not be considered "direct" unless it was both "substantial" and "foreseeable." (These requirements had previously been adopted by several circuit courts.) An effect is direct, the Court stated, "if it follows 'as an immediate consequence of the defendant's ... activity.' " --- U.S. at ----, 112 S.Ct. at 2168, 119 L.Ed.2d at 407. After noting that the plaintiffs had designated their accounts in New York as the place of payment, the Court concluded: "Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." Id.
 
 
 22
 In the instant case, appellant points out that its contract with MOP required payment in U.S. dollars through a "European/USA Bank." As a result of this provision, appellant contends, a United States bank necessarily had to be involved in the payment process. Appellant alleges that payment in U.S. dollars could only be accomplished by having the proceeds of the sale of defendants' oil transferred from a European bank to a United States bank for conversion of the proceeds into U.S. dollars. This is precisely what happened, appellant contends, with respect to the first two shipments of oil. The refiner ISAB forwarded payment for those shipments to the London Branch of the San Paolo Bank--which had been selected by UWT as the "European/USA Bank" specified in the contract. The San Paolo Bank then transferred the funds to its New York branch, which in turn transferred the funds through CitiBank of New York to be converted into U.S. dollars. The defendants' share of the proceeds was then credited to the defendants' account with a bank in Paris and UWT's share was transferred to its account in Denver.
 
 
 23
 Appellant's brief identifies several alleged "direct effects" that were brought about by MOP's refusal to supply any more oil under the contract. Foremost of these appears to be the fact that no additional oil proceeds were transferred to the United States for conversion into U.S. dollars. Appellant notes that CitiBank of New York did not receive a commission for the conversion of funds that it otherwise would have obtained. Appellant's losses in connection with providing ISAB a contractual guarantee are also cited by appellant as a direct effect of the defendants' actions. Additionally, appellant alleges that UWT suffered financial loss in the United States in the form of lost profits as a result of the defendants' actions.[3]
 
 III.
 
 24
 At the outset, we must concede that we have struggled to identify objective standards that would aid in determining what does and does not qualify as a "direct effect in the United States." The phrase itself seems hopelessly ambiguous when applied to any particular transaction. The guideposts previously adopted by many courts--the requirement that a direct effect be both "substantial" and "foreseeable"--was expressly rejected by the Supreme Court in Weltover. As a result, we are left to determine what qualifies as a direct effect largely from the Supreme Court's example in applying the statute to the facts before it in Weltover.
 
 
 25
 We have no doubt that the circumstances pointed to by appellant--such as the absence of a transfer and conversion of currency in the U.S., as well as the loss of profits and other harm to UWT--could reasonably be said to be "effects" caused by the defendants' actions. Such circumstances can be traced to the defendants' alleged act of refusing to deliver oil under the contract. We agree with the district court, however, that the defendants' actions in connection with the sale of oil to UWT cannot be said to have caused a direct effect in the United States.
 
 
 26
 The circumstances surrounding the transfer and conversion of currency in the United States is not a "direct" effect that would provide a basis for jurisdiction. Appellant attempts to cast this case in the image of Weltover, arguing that in both cases money that was supposed to have been forthcoming to the United States was not transferred here because of the defendants' actions. But the instant case differs in a significant respect from Weltover: no part of the contract in this case was to be performed in the United States. Under the contract, MOP was obligated to transfer oil from Kazakhstan to Sicily. No part of MOP's performance was to take place in the United States. Unlike Weltover, the defendants' performance of their contractual obligations had no connection at all with the United States. Cf. Weltover, --- U.S. at ----, 112 S.Ct. at 2168-69, 119 L.Ed.2d at 408 ("Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States....").
 
 
 27
 Contrary to appellant's argument, the payment provision of its contract with MOP does not provide a basis for finding that the defendants' activity had a "direct effect" in the United States. Pursuant to that provision, UWT was to make payment for the oil to MOP's bank in Paris. Thus, Paris was specified as the place of performance for UWT's contractual obligation. Appellant relies on the contractual provision stating that payment was to be made "in U.S. Dollars" by a letter of credit issued by a first class "European/USA Bank." We cannot agree that appellant's efforts to convert the funds into U.S. dollars, even if this meant that at some point a United States bank had to be involved, was a direct effect of the defendants' activity. An effect is "direct" if it follows as "an immediate consequence of the defendant's activity." Weltover, --- U.S. at ----, 112 S.Ct. at 2168, 119 L.Ed.2d at 407. The entire series of banking transactions that led to the conversion of the funds into dollars--from Sicily to London to New York to Paris--cannot be considered an "immediate consequence of the defendant's activity" under any common sense reading of that phrase. The requirement that an effect be "direct" indicates that Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States.[4] Such is the case here. The banking transfers referred to by UWT were only tangentially related to the performance of the parties contractual obligations--all of which were to take place outside of the United States. See Antares Aircraft, L.P. v. Federal Republic of Nigeria, 999 F.2d 33, 36 (2nd Cir.1993). Certainly Weltover does not stand for the proposition that any involvement in a commercial transaction by a United States bank means that a defendant's activity has had a "direct effect" in the United States. Cf. Antares Aircraft, 999 F.2d at 36 ("Unlike Weltover, where the parties had agreed that performance was to occur in New York, the sole act connected to the United States in the instant matter, the drawing of a check on a bank in New York, was entirely fortuitous and entirely unrelated to the liability of the appellees.") The performance of this contract was to take place entirely in Europe. The process by which UWT obtained an exchange of currency in the United States is simply too attenuated from the defendants' actions to be considered a "direct effect."
 
 
 28
 The defendants' failure to provide a bill of lading to ISAB in Sicily likewise did not have a direct effect in the United States. Appellant states that it obtained release of payment for the third shipment of oil by issuing a contractual guarantee to indemnify ISAB and asserts that it incurred expenses and potential liability in the United States in connection with the guarantee. Appellant's activities and asserted losses in connection with the guarantee, however, derive from UWT's contractual relationship with ISAB, not from its contract with the defendants. We agree with the district court that UWT's efforts to provide a guarantee to ISAB were dependent on an intervening factor--UWT's contractual arrangement with ISAB--that prevents those efforts from being considered "immediate consequences" of the defendants' actions. Such acts are analogous to the type of unilateral activity that the Supreme Court has found to be an insufficient basis for the exercise of jurisdiction under the Due Process Clause of the Fourteenth Amendment. See e.g., Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985).
 
 
 29
 Finally, we must conclude that UWT's allegation that it lost profits and suffered other harm in the United States as a result of the defendants' actions does not meet the requirements of Sec. 1605(a)(2). The immediate consequence of MOP's alleged breach of contract and fraud was that UWT did not receive funds from ISAB at the San Paolo Bank in London. Although the loss of these funds could be characterized as a "direct effect" of the defendants' act, we conclude that the direct effect cannot be characterized as occurring "in the United States." We recognize the amorphous nature of the issue before us. The attempt to locate the site of financial harm to a corporation, particularly where the cause of the injury is an omission, has been described by one court as "an enterprise fraught with artifice." See Texas Trading & Milling Corp. v. Federal Republic of Nigeria, 647 F.2d 300, 312 (2nd Cir.1981), cert. denied, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). The Second Circuit, in a decision subsequently affirmed by the Supreme Court, noted that courts "often look to the place where legally significant acts giving rise to the claim occurred" in determining the place where a direct effect may be said to be located. Weltover, Inc. v. Republic of Argentina, 941 F.2d 145, 152 (2nd Cir.1991), Cf. Weltover, --- U.S. at ----, 112 S.Ct. at 2168-69, 119 L.Ed.2d at 408. See also General Elec. Capital Corp. v. Grossman, 991 F.2d 1376, 1385 (8th Cir.1993). The basis or foundation of the action in this case was a contract entered into by the parties in Moscow. The contract called for the defendants to deliver oil from Kazakhstan to Sicily. When UWT's purchaser, ISAB, received oil shipments from the defendants it forwarded payment to UWT in London. Cf. Texas Trading, 647 F.2d at 312 (the financial loss occurred in the United States because the defendant's breach of contract prevented the plaintiffs, American corporations, from collecting money in the United States.)[5] UWT was then obligated under the terms of the contract to make payment to MOP in Paris. When all of the facts are examined together in this case, including the "legally significant acts," we are compelled to find that the direct effect of the defendants' alleged acts occurred in Europe rather than in the United States. The fact that UWT, had it received additional funds in London pursuant to the contract, would have then transferred those funds to the United States does not allow us to conclude that the loss suffered by appellant was sufficiently "in the United States" to warrant jurisdiction under Sec. 1605(a)(2). Cf. Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511, 1515 (D.C.Cir.1988) ("Appellant's injury, while financial rather than personal, was definitely suffered in Saudi Arabia, for it was there that the Ministry ... breached its contract with him. * * * [T]he breach's effect in the United States cannot said to be direct, for this effect is due to an intervening event--appellant's return here.").[6] See also Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 241 (2nd Cir.1994) (Foreign state's failure to remit funds in New York, as they were contractually bound to do, had a direct effect in the United States.) Nor is the fact that UWT is an American corporation that suffered a financial loss sufficient to place the direct effect of the defendants' actions "in the United States." Appellant would have us interpret Sec. 1605(a)(2) in a manner that would give the district courts jurisdiction over virtually any suit arising out of an overseas transaction in which an American citizen claims to have suffered a loss from the acts of a foreign state. We think that the language of Sec. 1605(a)(2) limiting jurisdiction to cases where there is a "direct effect" in the United States makes it unlikely that this was Congress' intent.
 
 IV.
 
 30
 The allegations set forth by appellant do not demonstrate that the defendants' actions caused "a direct effect in the United States" within the meaning of 28 U.S.C. Sec. 1605(a)(2). The judgment of the district court is therefore AFFIRMED.[7]
 
 
 
 *
 Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 The district court also found that the defendants were entitled to dismissal of the complaint for other reasons. In light of our ruling on the immunity question, however, we need not address these other issues
 
 
 [2]
 The defendant MOP was formerly subject to the control of the government of the Union of Soviet Socialist Republics. On December 16, 1991, the Republic of Kazakhstan became an independent sovereign state and MOP subsequently became subject to the jurisdiction and control of the Ministry of Energy and Fuel Resources of the Republic of Kazakhstan
 
 
 [3]
 To the extent appellant's brief identifies any alleged "effects" other than those set forth above, we conclude that they do meet the requirements of Sec. 1605(a)(2)
 
 
 [4]
 Appellant argues that we must interpret Sec. 1605(a)(2) in light of the Congressional purpose of ensuring access of U.S. citizens to the courts. Citing Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 490, 103 S.Ct. 1962, 1969-70, 76 L.Ed.2d 81, 90 (1983). While it is true that the FSIA was passed with such a purpose in mind, Congress was also concerned that "our courts [might be] turned into small 'international courts of claims[,]' ... open ... to all comers to litigate any dispute which any private party might have with a foreign state anywhere in the world." Id. Congress protected against this danger "by enacting substantive provisions requiring some form of substantial contact with the United States." Id. Our task is to determine from a reading of the plain language of the statute whether the requirements of Sec. 1605(a)(2) have been met
 
 
 [5]
 Appellant cites Texas Trading for the proposition that "any failure to make payments to an American corporation creates a direct effect 'in' the United States." App.Br. at 12. This is clearly an overstatement of the Texas Trading opinion. The Second Circuit based its conclusion that a direct effect in the United States had been shown on two facts, the first of which was that in keeping with the contract in that case the plaintiffs "were to present documents and collect money in the United States." Texas Trading, 647 F.2d at 312 (emphasis added). The court specifically noted that "[w]hether a failure to pay ... an American corporation overseas creates an effect 'in the United States' under Sec. 1605(a)(2) is not before us." Id
 
 
 [6]
 We recognize that Zedan is no longer "good law" insofar as it interpreted Sec. 1605(a)(2) as requiring a "substantial" and "foreseeable" effect. In our view, however, the above quoted passage is consistent with the Supreme Court's Weltover opinion
 
 
 [7]
 Plaintiff's motion to supplement oral argument is denied