**In re STONE & WEBSTER, INCORPORATED, et al., Debtors.**

**The Shaw Group, Inc., Plaintiff,**

**v.**

**Taiwan Power Company, Defendant.**

**Bankruptcy No. 00–02142(RRM).**
**Adversary No. A–01–84.**

United States Bankruptcy Court,
D. Delaware.

April 9, 2002.

Philip Trainer, Jr., Ricardo Palacio, Tiffany L. Geyer, Ashby & Geddes, Wilmington, DE, for The Shaw Group, Inc.

Kevin Gross, Edward B. Rosenthal, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, DE, Nicholas S. Reynolds, David C. Romm, Matthew J. Botica, Win-

ston & Strawn, Washington, D.C., for Taiwan Power Company.

## MEMORANDUM OPINION

McKELVIE, District Judge.

This is a breach of contract case brought as an adversary proceeding within the Stone & Webster, Inc. et al. bankruptcy case. Plaintiff The Shaw Group, Inc. is a Louisiana corporation engaged in the business of providing professional engineering, construction, and consultation services. Defendant Taiwan Power Company ("TPC") is a corporation of the Republic of China, Taiwan. TPC is an agency and/or instrumentality of the Republic of China, as all of its shares are held on behalf of the Ministry of Economic Affairs of the Republic of China.[1]

On February 7, 2001, Shaw filed its complaint and commenced this adversary proceeding against TPC. Shaw alleges that TPC breached a July 7, 2000 Memorandum of Understanding among Stone & Webster Engineering Corporation ("SWEC"), Stone & Webster International Corporation ("SWIC"), Shaw, and TPC, by failing to pay Shaw on certain overdue accounts receivable and retainage. The rights to those payments were purchased by Shaw pursuant to a July 14, 2000 Asset Purchase Agreement by and among Stone & Webster, Inc., certain Stone & Webster subsidiaries, and Shaw. Shaw also seeks a declaratory judgment that, due to TPC's breach, Shaw has no further contractual obligations to TPC.

On May 1, 2001, TPC filed a motion to dismiss Shaw's complaint, arguing (i) that it is immune from suit in the United States under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.;* (ii) that Shaw lacks standing to bring its claims; (iii) that this court, in its capacity as the bankruptcy court presiding over the Stone & Webster et al. bankruptcy proceedings, is without jurisdiction to hear Shaw's claims against it; and (iv) that the doctrine of *forum non conveniens* requires that Shaw bring its suit in the civil courts of the Republic of China. This is the court's decision on TPC's motion.

## I. *FACTUAL BACKGROUND*

The following facts are drawn from the factual allegations in Shaw's complaint. For purposes of this motion to dismiss, these allegations are accepted as true.

On December 3, 1997, SWIC and TPC entered into a Contract for Consultation Service for Design and Construction of the Lungmen Nuclear Power Project ("the TPC Contract"), located in Taiwan. Under the terms of the TPC Contract, SWIC agreed to provide engineering and project management services for the construction of the Lungmen power plant in consideration of the payment by TPC of approximately $72 million.

On June 2, 2000 (the "Petition Date"), SWIC and several of its affiliates (collectively, "the Debtors"), filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. At that time, the Debtors announced that they would seek to sell substantially all of their assets. Ultimately, an auction for the Debtors' assets was held in Wilmington, Delaware on July 6–7, 2000. At the begin-

---

1. The facts that support TPC's status as an agency or instrumentality of the Republic of China are set forth in TPC's declaration in support of its motion to dismiss. For a foreign corporate entity to qualify as an "agency or instrumentality" of a foreign state, "the majority of [its] shares or ownership interest [must be] owned by a foreign state or political subdivision thereof...." 28 U.S.C. § 1603(b). Shaw does not dispute that TPC is an agency or instrumentality of the Republic of China.

ning of the auction, it was uncertain whether the TPC Contract would be included among those assets to be transferred to the successful bidder, or whether it would be among the "rejected" contracts and, therefore, not included among the assets sold. As the bidding continued, however, Shaw decided to accept the TPC Contract as an asset/liability to be purchased, and removed that contract from the rejected contracts list. On the morning of July 7, at the conclusion of the auction, Shaw was declared the successful bidder for substantially all of the assets of SWEC, including the TPC Contract.

Thereafter, SWIC, SWEC, TPC, and Shaw entered into a Memorandum of Understanding relating to the TPC Contract (the "MOU"). Under the terms of the MOU, the Debtors would file a motion for leave to reject the TPC Contract. The MOU recognized, however, that "TPC will incur significant damages as a result of the rejection of the TPC Contract." Thus, in order to avoid those damages, and to allow for the unimpeded continuation of the Lungmen Nuclear Power Project, TPC and Shaw agreed to enter into a Replacement Contract, under which Shaw would complete the balance of the engineering services for the Lungmen Project.

According to the MOU, as a prerequisite to entering the Replacement Contract, Shaw was required to "[take] charge of the key SWIC employees working on the Lungmen Nuclear Power Project and all related know-how and intellectual property." It was further required that "the Debtors agree to continue working on the Lungmen Nuclear Project pending approval of the Motion" and that "upon approval of the Motion, each of the Debtors, TPC, and the Replacement Contractor [Shaw/Stone & Webster Asia, Inc.] agree to use [their] best efforts to cooperate fully with each other in order to effectuate a seamless transition" of the project from SWIC to Shaw. TPC, for its part, warranted in the MOU that it had paid SWIC for the services rendered since the Petition Date and further agreed "to reimburse SWIC (or [Shaw]) for all reasonable costs and expenses incurred by SWIC (or [Shaw]) in" effecting the transition contemplated in the MOU.

On or about July 14, 2000, the Debtors and Shaw entered into an Asset Purchase Agreement ("the Shaw Agreement"), under which Shaw purchased, among other assets of the Debtors, "all Accounts Receivable," excluding Completed or Rejected Contracts. Shaw submits that the TPC Contract with SWIC was not among the Completed Contracts or Rejected Contracts, as defined in the Shaw Agreement, but was among the contracts purchased therein. "Accounts Receivable" was defined in the Shaw Agreement as "all accounts receivable of any Seller, of whatever kind or nature, including all current or deferred rights of payment for projects completed or commenced or services rendered on or prior to the Closing Date, whether or not such projects have been billed by Sellers as of the Closing Date."

On July 13, 2000, this court entered the Sale Order, which approved the Shaw Agreement and all of its terms and conditions. Paragraph 36 of the July 13 Sale Order authorized the Debtors' execution of the MOU and deemed the TPC Contract rejected pursuant to § 365 of the Bankruptcy Code. Thereafter, on September 18, 2000, TPC and Stone & Webster Asia, Inc. ("SWAI"), executed the Contract for Continuation of Consultation Service for Design and Construction of the Lungmen Nuclear Power Project Phase II, the "Replacement Contract" called for by the MOU.

As of the Petition Date, the Debtors had completed approximately 50 percent of the work required under the TPC Contract.

Following the Petition Date, and up the execution of the Replacement Contract on September 18, 2000, the services required under the TPC Contract continued to be performed and TPC was invoiced for that work. TPC has paid all but six of the invoices. These six invoices (Nos. 58, 59, 61, 63, 64, and 65), totaling U.S. $1,845,878.65 plus N.T.[2] $12,619,512.00, were submitted to TPC pursuant to the TPC Contract and the MOU between June 27 and September 5, 2000 for work performed in furtherance of the Lungmen project as contemplated under the MOU.

TPC has refused to honor these invoices or Shaw's rights in those accounts receivable formerly held by the Debtors. Additionally, Shaw asserts that amounts believed to be U.S. $1,503,087 plus N.T. $25,872,196 in retainage previously withheld and therefore owing under the TPC Contract have also not been paid.

## II. *DISCUSSION*

In its Motion to Dismiss, TPC raises four independent grounds that it believes warrant the dismissal of Shaw's adversary complaint. Based on the court's review of the parties' briefs, the court concludes that, should it find that it has subject matter jurisdiction over this case under the Foreign Sovereign Immunities Act of 1976 ("the FSIA"), the court would not dismiss Shaw's complaint based on the latter three grounds. The court turns its attention, therefore, to the threshold question of whether TPC is immune to suit under the FSIA.

### A. *Is TPC Immune to This Suit Under the FSIA?*

TPC contends that it is immune to this suit under the FSIA, 28 U.S.C. § 1602 *et*

*seq.* The FSIA "establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state" or instrumentality.[3] *Republic of Argentina v. Weltover, Inc. et al.*, 504 U.S. 607, 610, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). Under the FSIA, "a foreign state shall be immune from the jurisdiction of the courts of the United States" unless one of several statutory exceptions applies. *See* 28 U.S.C. § 1604 (foreign sovereigns are presumptively immune from civil actions in the United States).

Courts must apply the FSIA "in every action against a foreign sovereign, since subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Accordingly, a court must presume that under the FSIA, actions taken by foreign states or their instrumentalities, such as TPC, are sovereign acts that are protected from the exercise of the court's jurisdiction, unless one of the exceptions to the FSIA applies. *See Crist v. Republic of Turkey*, 995 F.Supp. 5, 8 (D.D.C.1998).

To overcome the presumption of immunity, Shaw must prove that the conduct that forms the basis of its complaint falls within one of the statutorily defined exceptions. *Weltover*, 504 U.S. at 610–11, 112 S.Ct. 2160; *Federal Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1285 (3d Cir.1993). Shaw argues that TPC is subject to jurisdiction under the FSIA's "com-

---

**2.** "N.T." denominates Taiwan Dollars.

**3.** The FSIA definition of "foreign state" includes any entity that is an "agency or instrumentality of a foreign state." *See* 28 U.S.C.

§ 1603(a), (b). Shaw concedes for purposes of this motion that TPC qualifies as a "foreign state" under the FSIA.

mercial activity" exception, *see* 28 U.S.C. § 1605(a)(2). Generally speaking, the commercial activity exception of the FSIA "withdraws immunity in cases involving essentially private commercial activities of foreign sovereigns that have an impact on the United States." *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir.1994). The portion of the statute setting forth this exception provides that:

A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case ... in which the action is based upon

[i] a commercial activity carried on in the United States by a foreign state; or

[ii] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or

[iii] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

The parties do not dispute that the acts upon which this suit are "based" are TPC's alleged failures to make required payments under the TPC Contract. Although TPC concedes that this alleged activity is correctly characterized as "commercial" under the FSIA, *see* 28 U.S.C. § 1603(d) (defining "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act"),

it nonetheless asserts that this court may not exercise jurisdiction over it, because there is an insufficient nexus between the alleged commercial acts and the United States. TPC argues that because the disputed invoices were not payable in the United States,[4] the failure to pay those invoices cannot fall under the exceptions in clauses (i) or (ii) of § 1605(a)(2) for "a commercial activity carried on in the United States" or "an act performed in the United States." Therefore, the only potentially applicable commercial activity exception remaining is the "direct effect in the United States" exception found in clause (iii).

TPC claims that this third and final clause of the "commercial activities" exception also does not apply, because TPC's alleged acts have no "direct effect" in the United States, within the meaning of 28 U.S.C. § 1605(a)(2)[5]. In support of its position, TPC relies on cases such as *Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 726 (9th Cir.1997), and *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1239 (10th Cir.1994), for the proposition that mere financial loss to an American corporation is not sufficient to constitute a "direct effect" in the United States where the contract—specifically the defendant's payment thereunder—is to be performed outside of the United States. *Cf. Weltover*, 504 U.S. at 619, 112 S.Ct. 2160 (finding direct effect in the United States for breach of contract

---

**4.** The disputed invoices state that they are payable, via electronic transfer, to Stone & Webster's accounts at the Farmers Bank of China, His Chih Branch, and to the Standard Chartered Bank, Taipei Branch. According to a letter from S. Chow of Stone & Webster to TPC, the payment of all outstanding invoices—including the all of the disputed invoices—to bank accounts in Taiwan was effective as of May 4, 2000. The TPC Contract

governing the retention payment does not designate a place of performance.

**5.** TPC does not dispute that the first two requirements of clause (iii) are satisfied: (i) Shaw's suit is based on TPC's alleged acts outside the United States, or (ii) that those acts are "in connection" with a commercial activity of a foreign states outside this country.

case where "New York was the place of performance for Argentina's ultimate contractual obligations"); *see also Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 999 F.2d 33, 35 (2d Cir.1993) (stating that financial loss to United States corporation alone is insufficient to demonstrate "direct effect in the United States"); *General Elec. Capital Corp. v. Grossman,* 991 F.2d 1376, 1385 (8th Cir.1993) ("in order for a 'financial loss to be "direct," the corporate entity must itself be placed in financial peril as an immediate consequence of the defendant's unlawful activity.'") (quoting citation omitted); *Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511, 1515 n. 2 (D.C.Cir.1988) ("the terms of ... a contract would, at the very least, have to specify a particular location in the United States, even perhaps the particular bank through which payment was to be made, before the breach could be said to cause ... direct ... effect in the United States").

Thus, TPC reasons that the acts that this suit is "based upon" do not have a direct effect in the United States because Stone & Webster's performance under the TPC Contract and the MOU and Shaw's performance under the MOU and the Replacement Contract were all due in Taiwan and the place of performance designated for TPC's payment of the disputed invoices was in Taiwan. Shaw, in response, argues that because the MOU was made and negotiated in the United States and because portions of the MOU were performed in the United States, TPC's breach of the MOU does have a direct effect in the United States.

 Based on the parties' positions, the only provision of the "commercial activities" exception that the court must consider is the third clause of § 1605(a)(2), "the direct effect in the United States" provision. "[A]n effect is direct if it fol-lows as an immediate consequence of the defendant's activity." *Weltover,* 504 U.S. at 618, 112 S.Ct. 2160 (rejecting requirement that effect be both "substantial" and "foreseeable" in order to be direct). It has been stated that in construing the terms "direct effect in the United States, courts should be ... mindful of Congress's concern of providing access to the courts to those aggrieved by the commercial acts of a foreign sovereign.... No rigid parsing of § 1605(a)(2) should lose sight of that purpose." *Tifa Ltd. v. Republic of Ghana,* 692 F.Supp. 393, 403 (D.N.J.1988) (citing *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 317 (2d Cir.1981)); *but see United World Trade,* 33 F.3d at 1238 n. 4 (stating that Congress also intended to safeguard against our courts becoming "small international courts of claims" and "protected against this danger 'by enacting substantive provisions requiring some form of substantial contact with the United States.'").

Despite the above quoted language, which suggests that courts should and may construe the "direct effect" provision liberally, the court is unaware of any case in which mere financial loss to a United States corporation arising from the breach of a contract under which both payments and services were to take place outside of the United States, was found to be sufficient to confer jurisdiction under clause (iii) of § 1605(a)(2). In *Texas Trading,* the Second Circuit concluded that the "direct effect" test was satisfied, because the American corporation suffered financial loss *and* the foreign corporation defendant was to present documents and collect money in United States. Similarly, in concluding that the "commercial activities" exception was met in *Weltover,* 504 U.S. at 619, 112 S.Ct. 2160, the Supreme Court noted that the defendant's obligations that were at issue in the case had a "direct effect"

because the parties had "designated their accounts in New York as the place of payment [making] New York . . . the place of performance for Argentina's ultimate contractual obligations." *See also, e.g., United World Trade,* 33 F.3d at 1237 (noting that defendant was immune from suit in United States because, unlike *Weltover,* no part of defendant's performance under the contract was to take place in the United States).

■ In Shaw's answering brief, it argues that TPC's breach of the MOU caused a direct effect in the United States because (i) TPC participated in the underlying bankruptcy proceedings to safeguard its interests and negotiated and executed the MOU in Delaware [6] for the purpose of effecting a "seamless transition" from SWIC to Shaw; and (ii) under the TPC Contract, Shaw performed certain inspection, design, and engineering services (for which TPC was billed) in Boston, Massachusetts before delivering the work to Taiwan for approval. The relevant inquiry under the FSIA, however, is not whether TPC had contacts with the United States; it is whether the commercial acts that the suit is based upon had a direct effect in the United States. *See Federal Ins. Co.,* 12 F.3d at 1290. As Shaw's suit is based upon TPC's alleged failure to pay certain invoices that were both issued and payable abroad for work on a project in Taiwan, the fact that the contract at issue was negotiated, executed, or that Shaw did some of its work in the United States does not demonstrate that TPC's failure to pay under the contract caused a direct effect in the United States.

The cases that Shaw cites to establish that the contacts in this case are sufficient to establish that the commercial activities exception applies are distinguishable. More importantly, it should be noted, their rationale is not inconsistent with the cases cited by TPC in support of dismissal. In *Wasserstein Perella Emerging Markets Fin., L.P. v. Formosa,* 2000 WL 573231, *10 (S.D.N.Y. May 11, 2000), the court found that the defendant foreign sovereign was subject to jurisdiction under the commercial activities exception. There, however, the defendant had agreed to close and repay a loan in New York, and pursuant to the loan, "transferable securities in the form of promissory notes would have been offered for sale in the United States." Therefore, the court concluded that its alleged breach caused a direct effect in the United States. In *Honduras Aircraft Registry, Ltd. v. Honduras,* 129 F.3d 543, 545–46, 549 (11th Cir.1997), the suit was based upon the breach of a contract to develop and maintain offices and a computer database in Florida. No such connection is present in the case at bar. The TPC Contract and MOU contemplated that both parties' performance—the project work and the payment for that work—take place in Taiwan. Moreover, the express purpose of the MOU was to act as a bridge between two separate contracts (the TPC Contract and the Replacement Contract), and thereby avoid the interruption of work on the Lungmen project. Both of the contracts relating to the Lungmen project are subject to Republic of China law on their face. All of this suggests that the proper forum for Shaw's suit is in the Republic of China.

In light of the above finding, the court need not reach TPC's remaining bases for dismissal.

---

**6.** TPC opposes Shaw's characterization of where the agreement was negotiated and executed, but for purposes of this motion the court will assume it was negotiated and executed in the United States.

## III. *CONCLUSION*

Because TPC is a "foreign state," within the meaning of the FSIA, jurisdiction over it can only be proper if Shaw demonstrates that a statutory exception to the FSIA applies. Although Shaw contends that the "commercial activities" exception applies, for the reasons stated above, the court disagrees. Should Shaw seeks to pursue its claims against TPC, it must pursue them in courts of the Republic of China.

Although the court is sympathetic to Shaw's claims, based on the foregoing jurisdictional analysis under the FSIA, which the court is required to conduct as a threshold matter, the court is compelled to dismiss the case.