FILED
United States Court of Appeals
Tenth Circuit

July 15, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

BIG SKY NETWORK CANADA,
LTD., a British Virgin Islands
corporation,

     Plaintiff-Appellant,

v.

SICHUAN PROVINCIAL
GOVERNMENT, a subdivision of the
People's Republic of China, and
QINGYANG DISTRICT
GOVERNMENT, a subdivision of the
People's Republic of China, a foreign
state,

     Defendants-Appellees.

No. 07-4014

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:06-CV-00265-PGC)**

---

Matthew N. Evans of Ray Quinney & Nebeker P.C. (Maria E. Heckel, with him
on the brief), Salt Lake City, Utah, for Plaintiff-Appellant.

Christopher T. Handman of Hogan & Hartson LLP, Washington, D.C. (Craig A.
Hoover and Jake M. Shields of Hogan & Hartson LLP, Washington, D.C., and
Robert S. Clark and Kara M. Houck of Parr Waddoups Brown Gee & Loveless,
Salt Lake City, Utah, with him on the brief), for Defendants-Appellees.

---

Before **MURPHY, HARTZ,** and **GORSUCH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

Seeking to capitalize on the growth of broadband cable access in China, Big Sky Network Canada ("Big Sky") formed a joint venture with a Chinese company to provide cable services to Chengdu City, the capital of Sichuan Province in central China. In response to a subsequent national directive banning foreign ownership of cable companies, two sub-national governments – the defendants in this action – allegedly required Big Sky's Chinese partner to terminate the joint venture. Rather than negotiate a dissolution of the joint venture, however, Big Sky's Chinese partner purportedly pocketed Big Sky's investment. Big Sky brought suit in Utah state court, not against its business partner or the Chinese government, but against the defendant sub-national governments. The governments sought to remove the case to federal court, but filed their removal request three weeks late. Finding sufficient cause for the delay, the district court accepted the governments' tardy removal. The governments then filed a motion to dismiss for lack of subject matter jurisdiction, which the district court also granted. Big Sky now appeals both rulings. Because the governments have offered reasons beyond simply their status as foreign sovereigns to support the extension of the removal period, and because Big Sky cannot identify any statutory exception to the sovereign immunity Congress has granted foreign sovereigns in our courts, we affirm.

I

Assuming for purposes of this appeal the truth of the allegations in Big

Sky's complaint, they suggest that, in 2000, Big Sky, a British Virgin Islands

corporation with offices in Canada, formed a joint venture with Chengdu Huaya

Information Industry Co., Ltd. ("Huaya").  The purpose of the joint venture was

to supply cable broadband services to Chengdu City, the capital of Sichuan

Province in central China.  At the time, Huaya represented that it owned the

"Huaya HFC Network," a fiber-optic network, along with associated hardware

and software platforms, and had the right to use the network for Internet and data

transmissions within Chengdu City.  Huaya contributed its rights to the Huaya

HFC Network to the joint venture, while Big Sky made a capital contribution

totaling approximately $1,875,000.  The initial term established for the joint

venture was 20 years, with profits during that period expected to exceed

$20,000,000.

On May 11, 2001, the Chinese State Administration of Radio Film and

Television issued a "notice" prohibiting the operation of cable television networks

"by foreign-funded, Sino-foreign joint and Chinese-Foreign Contractual Joint

Ventures or by private capitals."  Aplt. App. at 14.  The notice required that the

> Radio Film and Television Administration Department of the provinces,
> autonomous regions and special municipalities must clear up the
> financing on its radio and TV cable network against regulations,

differentiate the various situations, come up with applicable solutions and submit to the State Administration of Radio Film and Television before June 10.

*Id*. On June 4, less than a month later, the Sichuan Province Administration of Radio Film and Television issued a notice that mirrored in substance the national notice.

Despite the national and regional edicts to the contrary, Huaya did not immediately take any steps to "clear up the financing" of the joint venture. Apparently unknown to Big Sky, however, it turned out that Huaya was not the sole owner of the Huaya HFC Network; Sichuan Huashi Cultural Development Co., Ltd. ("Sichuan Huashi"), a corporation controlled by the defendant Qingyang District, a local district of Chengdu City, owned some portion of the Huaya HFC Network and decided to withdraw control of its portion from Huaya's control, citing the provincial notice of June 4 as compelling its action. On December 12, 2002, Huaya and Sichuan Huashi signed a division agreement memorializing Huaya's loss of control. Remarkably, Huaya tried to reassure Big Sky that all was well. In a letter to Big Sky dated December 16, Huaya indicated that their joint venture retained the right to use the network. Huaya also assured Big Sky that if early termination of the joint venture did become necessary, the parties would negotiate a settlement. Despite these assurances, in July 2003 Huaya notified Big Sky that it was terminating the joint venture and no effort at a financial settlement would be forthcoming.

Big Sky responded by filing suit in state court in Utah in 2005. Curiously, it did not sue Huaya, its erstwhile business partner, Sichuan Huashi, or the Chinese national government responsible for the edict banning its foreign investment. Instead, it targeted its state lawsuit against the two sub-national defendant governments before us, asserting state-law claims for intentional interference with contractual relations and unjust enrichment, and the parties agree that Big Sky successfully effected service on the defendant governments on February 6, 2006.

On March 30, 2006, the defendant governments filed a notice of removal and a motion for enlargement of the removal period in federal district court in Utah. Normally, an eligible defendant has thirty days in which to effect removal of its case to federal court. 28 U.S.C. § 1446(b). But where the defendant is a foreign state as defined by the Foreign Sovereign Immunities Act ("FSIA"), Congress has expressly indicated that the removal period may be enlarged for cause. 28 U.S.C. § 1441(d). In this case, the district court found that the governments had demonstrated sufficient cause to warrant enlarging the removal period by what amounted to roughly three weeks. Having successfully found a federal venue in which to mount their defense, the governments next filed a motion to dismiss for, among other things, lack of subject matter jurisdiction under the FSIA, which the district court also granted. Big Sky now appeals both the district court's removal and dismissal decisions, and we address each in turn.

II

A

Because we have not previously reviewed a district court decision respecting the enlargement of the FSIA removal period, we must pause briefly to consider what our standard of appellate review should be. Unfortunately, the FSIA does not expressly provide a standard of review. But this is hardly an uncommon occurrence, *see Pierce v. Underwood*, 487 U.S. 552, 558 (1988), and the plain language of the statute offers useful clues suggestive of Congress's intent.

In particular, the FSIA's removal provision provides that "[w]here removal is based upon this subsection, the time limitations of section 1446(b) of this chapter may be enlarged at any time for cause shown." 28 U.S.C. § 1441(d). Notably, the language of the statute is permissive, rather than mandatory: a district court "may" enlarge the removal period if cause is shown, but is not required to do so. *See United States v. Rodgers*, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion."). Nothing else in the statute refutes this common sense reading; to the contrary, the fact that removals may be taken "at any time" for "cause" shown underscores that Congress intended the district court to exercise a degree of discretion in assessing requests to enlarge the removal period.

When Congress commits a decision to the discretion of the district court, our review is properly limited to assessing only whether the district court's decision amounts to an abuse of that discretion. The formulation may appear opaque, but it is one we have long understood to mean that we will reverse a district court's determination only if the court exceeded the bounds of the rationally available choices given the facts and the applicable law in the case at hand. *United States v. McComb*, 519 F.3d 1049, 1053-54 (10th Cir. 2007). That is to say, we recognize that in many cases there will not necessarily be a single right answer, but a range of possible outcomes the facts and law at issue can fairly support; rather than pick and choose among them ourselves, we will defer to the district court's judgment so long as it falls within the realm of these rationally available choices. *Id*.; *see also Romero v. Peterson*, 930 F.2d 1502, 1505 (10th Cir. 1991) (reviewing extension of time to file a notice of appeal for abuse of discretion); *Teigen v. Renfrow*, 511 F.3d 1072, 1077 n.2 (10th Cir. 2007) (reviewing extension of time to file brief for abuse of discretion).

From both this statute in particular and analogous areas of law, we discern some principles that help delimit the range of permissible choices available to a district court under Section 1441(d), and thus assist in defining our appellate role. Under the terms of the statute, the defendant bears the burden of establishing a "cause" for its extension. 28 U.S.C. § 1441(d). The defendant, in other words, must come forward with an affirmative justification for its delay. Further, the

- 7 -

application of Section 1441(d) to *all* foreign states compels the conclusion that mere status as a foreign state named a defendant in a suit in the United States is inadequate, standing alone, to establish "cause" for extending the removal period. After all, if status as a foreign sovereign were enough to justify enlarging the removal period, literally every member of the group to whom the statute applies would qualify for enlargement simply by virtue of its membership. Such a reading would render meaningless the limitation Congress placed on the district court's discretion – namely, that enlargement could only be for "cause"; and we are of course loathe to give a statute an interpretation that makes superfluous any congressionally chosen term. *Hill v. Kemp*, 478 F.3d 1236, 1247 (10th Cir. 2007). As the court in *Ponce v. Alitalia Linee Airee*, 840 F. Supp. 550, 551 (N.D. Ill. 1993), which had occasion to address this question some time ago, explained, "the 'cause shown' provision under Section 1441(d) has to connote some proof of a justification other than the extended pleading period that is automatically conferred on the foreign state . . . . And that added showing should be meaningful in substantive terms." We agree and so hold.

In many analogous areas, once a defendant comes forward with a permissible "cause" for an extension of time whether that cause justifies the extension sought is considered in light of certain surrounding circumstances. So, for example, in cases involving a motion to extend the time to file a notice of appeal under Federal Rule of Appellate Procedure 4(a)(5), we have identified four

factors relevant to the district court's decision to grant the motion: "the danger of prejudice to the nonmoving party, the length of the delay and its potential impact on judicial proceedings, the reason for the delay [i.e., cause], . . . , and whether the movant acted in good faith." *City of Chanute v. Williams Natural Gas Co.*, 31 F.3d 1041, 1046 (10th Cir. 1994) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)); *see also Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205 (10th Cir. 2006) (discussing similar factors in the context of a delay in seeking leave to amend a complaint under Fed. R. Civ. P. 15(a)); *Rogers v. Andrus Transp. Servs.*, 502 F.3d 1147, 1151-52 (10th Cir. 2007) (same in the context of dismissing for failure to prosecute); *United States v. Flanders*, 491 F.3d 1197, 1216 (10th Cir. 2007) (same in the context of a motion for a continuance). These considerations seem to us equally appropriate when deciding whether to extend the time to remove a case under Section 1441(d). The sufficiency of an asserted "cause" for delay can only be rationally assessed in light of the degree of delay and prejudice it entails, and whether it is offered in good faith. Accordingly, the longer or more prejudicial a delay, the greater the need will be for a defendant to come forward with a strong justification for an extension; the less delay or prejudice involved, the less weighty an asserted cause need be. *See, e.g.*, *Minter*, 451 F.3d at 1205 ("The longer the delay, the more likely the motion to amend will be denied, as protracted delay, with its attendant

burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend." (internal quotations omitted)).

B

In this case, the district court found sufficient cause to grant defendants' request for an extension of time based on, among other things, their argument that they are "far-flung local governments in southwestern China that have never before been haled into an American court."[1]  Answer Br. at 23.  The district court and defendants also emphasized that the extension sought in this case was only three weeks, that it was sought in good faith, and that seeking removal was the very first act the governments took in this litigation, meaning that neither the Utah state courts nor Big Sky had any of their efforts effectively canceled by a delayed removal.[2]

---

[1]  Neither does Big Sky dispute the assertion that the governments are first-time litigants in our courts.  Big Sky confines itself to arguing that the governments' counsel has represented other Chinese provinces in the United States.  That the defendants hired experienced counsel, however, does not change the fact that at the time they were served, they had no experience litigating in American courts and, apparently, no American counsel.  The significance of the fact they eventually retained counsel who had represented other Chinese provincial governments is left unclear and undeveloped by Big Sky.  Big Sky does not, for example, allege or prove that the defendants before us had any preexisting relationship with counsel, or were required by any central authority to employ the counsel they ultimately selected.

[2]  The defendants offered the district court a lengthy list of reasons for their delay, including that neither had previously been sued in the United States.  *See* Memorandum in Support of Motion to Enlarge Removal Period at 4-5.  Although it did not specifically enumerate all of the reasons cited to it by defendants, in

(continued...)

- 10 -

We cannot say the district court's analysis constitutes an abuse of discretion. Critically, defendants did not merely rely on their status as foreign states as "cause" for their requested extension, but instead stressed those concerns that differentiate sub-national entities with no experience in American litigation from more sophisticated entities that also qualify as "foreign states" within the meaning of the FSIA. The statute, after all, defines as "foreign states" for immunity purposes a wide variety of entities, ranging from national governments and their constituent agencies to state-owned enterprises to local governments. *See* 28 U.S.C. § 1603. And it is not unreasonable to think that sub-national governments – particularly one such as Qingyang District, a local district government within Chengdu City – might be expected to encounter difficulties in far-flung litigation that do not attend national governments or even state-owned corporations widely engaged in international commerce and litigation. Such local entities may have, for example, resource and personnel constraints that would not hamper more sophisticated governmental organizations that happen to, or even are created with the express intent that they, interact regularly with their foreign counterparts. And, as here, local governmental entities may simply lack the institutional experience necessary to respond to certain challenges expeditiously.

---

[2](...continued)
finding sufficient cause to grant defendants' motion the district court appears to have adopted *in toto* defendants' "extensive list of reasons" and "good-faith representations." Removal Op. at 7, 11.

Such considerations, we think, bearing as they do on the specific challenges faced by particular defendants, rather than on those challenges faced by all "foreign states" haled into American courts, may properly be considered in the district court's calculus.

Examining this cause in light of the surrounding circumstances, we also find important the relatively short extension sought, the lack of prejudice to Big Sky or the state courts of Utah, and the absence of any evidence of bad faith, all of which collectively indicate that the district court's discretion was at its broadest. We do not say, or suggest, that longer, more prejudicial or bad faith delays could be sustained on this same showing of cause, or, for that matter, that simply being a local government guarantees an automatic extension of the removal period. Rather, our holding that the district court's decision did not exceed the bounds of permissible choice is limited to the facts before us: local governments, litigating for the first time in American courts, asking in good faith for a brief extension that results in no prejudice.

At the same time, we reject the argument, advanced by defendants and the district court, that the extension of time sought here was also justified based on a purported congressional purpose "that civil cases involving foreign states and their subdivisions be litigated in the federal courts to ensure uniformity in the law and proper treatment of foreign sovereigns." Removal Op. at 9. If Congress had wished to grant exclusive jurisdiction to the federal courts over suits involving

foreign governments, it could have so said. Instead, Congress expressly left open the possibility for litigation to proceed in state courts, placing limits – however modest – on the ability of foreign states to remove litigation against them from state to federal courts.

For similar reasons, we expressly disapprove any reliance on the "discrepancy between the 60-day response to complaint period . . . and the 30-day removal provision." *Id*. at 8. While it is true that Congress has afforded foreign states sixty days to answer a complaint, 28 U.S.C. § 1608(d), but only thirty days to remove a case, 28 U.S.C. § 1441(d); 28 U.S.C. § 1446, and equally true that this difference might result in some confusion, defendants may not rely on this discrepancy – applicable to all foreign states – to obtain an extension. If Congress had deemed the discrepancy a cause for extension, it "could readily and simply have created an invariable 60-day removal period for foreign states." *Ponce*, 840 F. Supp. at 551. But Congress chose not to do so, and we are not free to replace Congress's policy judgment with our own. Instead, we affirm the district court solely based on its reference to the brief length of delay, lack of prejudice or bad faith, and the specific challenges facing these defendants. While we do not mean to suggest that the district court would have erred in denying defendants' requested extension, neither can we say that the district court abused its discretion in granting it.

We now turn to the question whether the district court had subject matter jurisdiction over this dispute. Because the parties' arguments are purely legal in nature, our review proceeds *de novo*. And it begins with the plain language of the FSIA. There, Congress provided that "foreign state[s] shall be immune from the jurisdiction of the courts of the United States and of the States." 28 U.S.C. § 1604. That grant of immunity, however, is riddled with exceptions, *see* 28 U.S.C. §§ 1605 & 1607, and the applicability of one of these exceptions is a prerequisite to the district court's jurisdiction over an action in which a foreign sovereign is named a defendant, *Orient Mineral Co. v. Bank of China*, 506 F.3d 980, 991 (10th Cir. 2007).

In determining whether a defendant government can claim the benefits of sovereign immunity, we have indicated that we will employ a burden shifting analysis. *Id.* First, the defendant must make a *prima facie* showing that it is a foreign state. *Id.* While not literally "foreign states" themselves in the common meaning of that term, Sichuan Province and Qingyang District are political subdivisions of the People's Republic of China, and, as noted earlier, political subdivisions of foreign states are "foreign states" within the meaning of the FSIA. 28 U.S.C. § 1603. Neither does Big Sky dispute this fact, conceding in its complaint that both governments are "subdivision[s] of the People's Republic of China." Aplt. App. at 12. The burden therefore shifts to Big Sky to make an

initial showing that one of the FSIA's exceptions applies; if it succeeds, the defendants bear the ultimate burden of proving, by a preponderance of the evidence, that the exception does not apply. *Orient Mineral Co.*, 506 F.3d at 991-92.

As it happens, Big Sky only argues that one exception – the third clause of the so-called commercial activity exception – pertains to this case. In relevant part, the commercial activity exception provides that a

> foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605. Under the statute's terms, then, Big Sky must show that its suit is (1) based upon an act outside the territory of the United States; (2) that was taken "in connection with a commercial activity" of the defendant governments outside this country; and (3) that "cause[d] a direct effect in the United States." *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992). Because Big Sky does not dispute that it is a British Virgin Islands corporation residing in Canada, it identifies as the jurisdictionally-relevant "direct effect in the United States" certain harms suffered by its parent corporation, China Broadband, a Nevada corporation.[3] Specifically, Big Sky notes that, as a result of Big Sky's

---

[3] Before the district court Big Sky asserted that both its and China Broadband's injuries were direct effects suffered in the United States. On appeal,

(continued...)

- 15 -

lost investment, China Broadband suffered financially, lost profits, and was forced to reorganize.

We do not doubt that drawing lines between what qualifies as a direct, rather than an indirect, effect, like efforts to distinguish between proximate and contributing causes, is a slippery business. *See Prosser and Keeton on the Law of Torts* 263 (5th ed., 1984) ("There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion," as causation doctrine.); *see also Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1078 (10th Cir. 2008). Happily, we have no need to draw such lines ourselves in this case, as it is controlled by our settled precedent. In *United World Trade, Inc. v. Mangyshlakneft Oil Production Ass'n*, 33 F.3d 1232 (10th Cir. 1994), this court confronted a situation in which an American corporation was to receive payment, pursuant to a contract formed in Moscow, at a bank in London. *Id*. at 1235-36. The only connection to the United States was that the plaintiff American corporation intended to transfer the funds it received in London back to the United States. We concluded that, while the failure to receive payment in London might be characterized as a "direct effect," it could not be said to have occurred "in the United States," rather than in London, where payment was due. *Id*. at 1238-39. And in discussing the effect of

_____

[3](...continued)
however, Big Sky renews this argument only with respect to China Broadband's injury.

- 16 -

the nationality of the plaintiff on our analysis, we held the mere fact that an American corporation ultimately "suffered a financial loss" in the United States was insufficient "to place the direct effect of the defendants' actions in the United States." *Id*. at 1239. To allow such a loss to be the basis for jurisdiction "would give the district courts jurisdiction over virtually any suit arising out of an overseas transaction in which an American citizen claims to have suffered a loss from the acts of a foreign state." *Id*. Such a result, we held, was inconsistent with Congress's intent to limit jurisdiction to those cases in which the act caused a "direct" effect. *Id*.

*United World Trade* thus set down the rule that an American corporation's failure to receive promised funds abroad will not qualify as a "direct effect in the United States." The "direct effect" in such a case is the failure to receive the funds, which occurs abroad, *id*. at 1238-39, and the financial injury, though ultimately felt in the United States, is too attenuated to qualify as direct, *id*. at 1239. As even Big Sky suggests in its opening brief, its case is squarely governed by this rule. China Broadband's financial injuries – while ultimately felt in the United States – are derivative of a financial injury Big Sky suffered in China, and thus are not sufficiently direct under our case law to invoke the commercial activity exception. If anything, the causal chain in the case before us is even more attenuated than it was in *United World Trade* because, here, the company that suffered the loss abroad (Big Sky) does not even operate in the

- 17 -

United States and is not the same as that claimed to have suffered the jurisdictionally-relevant effects in the United States (China Broadband). It is only through the losses of a foreign subsidiary abroad that China Broadband claims to have suffered a direct effect in the United States. So, the only meaningful distinction between our case today and *United World Trade* – where the direct financial loss felt abroad and the resulting financial injuries felt in the United States were visited on the same company – is one that cuts decidedly against China Broadband's injuries constituting a "direct effect."[4]

Neither do we accept Big Sky's contention that our holding in *United World Trade* is inconsistent with the Supreme Court's decision in *Weltover*.[5] In *Weltover*, two Panamanian corporations and a Swiss bank owned bonds issued by Argentina. 504 U.S. at 610. The bonds provided for payment of interest and principal in U.S. dollars in either London, Frankfurt, Zurich, or New York, at the

---

[4] Others have had occasion to pass on the question whether one may *ever* properly assert another's injuries for jurisdictional purposes under Section 1605(a)(2), *see, e.g., Corzo v. Banco Cent. De. Reserva del Peru*, 243 F.3d 519, 526 (9th Cir. 2001), but we have no occasion to do so today; even assuming Big Sky may cite China Broadband's injuries, they were not the result of a direct effect in the United States.

[5] In its briefs, Big Sky suggests that *United World Trade* imposed a requirement that the "direct effect in the United States" must be "legally significant," and that this rule is incompatible with *Weltover*. Since the time briefs were filed in this case, however, we have made clear that *United World Trade* did not adopt any "legally significant acts" test. *Orient Mineral Co.*, 506 F.3d at 998. Thus, all that is left of Big Sky's complaint is that *United World Trade*'s holding – that financial loss to an American corporation initially suffered abroad cannot constitute a direct effect – is irreconcilable with *Weltover*.

election of the bondholder. *Id*. at 609-10. When the bonds matured, the two corporations and the bank elected to receive payment in New York, but Argentina defaulted on the debt. *Id*. at 610. The bondholders subsequently brought suit in the Southern District of New York for breach of contract, and Argentina moved to dismiss for lack of subject matter jurisdiction. *Id*. The Supreme Court held that subject matter jurisdiction existed under the same provision before us today, reasoning that New York was "the place of performance for Argentina's ultimate contractual obligations," and that therefore the direct effect of Argentina's default was felt in New York. *Id*. at 619. In our case, by contrast, the joint venture did not require any action in the United States, the failure of which to occur could constitute a direct effect; the direct effect of defendants' acts – the loss of Big Sky's investment through the termination of the joint venture – occurred instead in China.

Big Sky, however, argues that if the mere failure to receive money, without any further consequences, was an effect sufficient to trigger jurisdiction in *Weltover*, where the plaintiffs were foreign corporations, then surely the failure of an American company to receive money, with the result that the company was forced to restructure its operations, is sufficient as well. We do not doubt that having to reorganize one's business might well be a more *substantial* effect than simply failing to receive payment. But *Weltover* itself rejected "the suggestion that § 1605(a)(2) contains any unexpressed requirement of 'substantiality.'" *Id*.

- 19 -

at 618. Instead, we look at only two facets of an effect to determine whether it can be the basis for jurisdiction under the third prong of the commercial activity exception: whether it is direct and whether it is in the United States. At most, the parties before us today contemplated that at some point down the road contractual payments made to Big Sky – outside of the United States – would be passed through to China Broadband in the United States. While we have no trouble concluding that the failure of the latter to happen is an effect, and perhaps even a substantial one, our case law precludes any conclusion that it is a direct one.[6]

* * *

Because the district court did not abuse its discretion in enlarging the removal period based in part on the specific challenges faced by these defendants as sub-national governments appearing in United States court for the first time, the brief length of the delay, and the lack of prejudice to Big Sky, we affirm the district court's decision to grant the governments an extra three weeks to remove their case. Also, under our case law mere financial loss to an American corporation resulting from the failure to receive monies abroad cannot constitute a direct effect within the meaning of the commercial activity exception to the FSIA,

---

[6] Because we conclude that the district court lacked subject matter jurisdiction, we have no need to consider the alternative grounds the governments offer for affirming the district court's dismissal of this suit.

and so we conclude that the district court lacked subject matter jurisdiction over Big Sky's complaint.

*Affirmed.*