BRISCOE, Chief Judge,
concurring in part in the result, and dissenting:
I respectfully concur in part, and dissent in part. The majority fails to give sufficient weight to the fact that the taser used by Officer Harris on August 4, 2006, had a targeting function, that Officer Harris fired at Ryan Wilson from only ten to fifteen feet away, and that the training manual specifically warned officers against aiming at the head or throat unless necessary. In light of this, I would hold the 42 U.S.C. § 1983 excessive force claim filed by Ryan Wilson’s estate against Officer Harris can survive summary judgment, potentially resurrecting the other federal and state claims. That said, I would affirm the district court’s dismissal of Wendy Wilson’s 42 U.S.C. § 1988 wrongful death claims and the challenged evidentiary ruling. Accordingly, I would affirm in part, reverse in part, and remand.
I
Because the majority focuses solely on a single § 1983 excessive force claim against Officer Harris, I believe it helpful to set forth a more detailed procedural history in order to understand the issues raised on appeal.
Plaintiffs filed two separate suits in Colorado state court — one by Jack Wilson, Ryan Wilson’s father, for himself and Ryan’s estate, and one by Wendy Wilson, Ryan Wilson’s mother, for herself and Ryan’s estate. The cases were removed to the United States District Court for the District of Colorado and were consolidated. Jack Wilson asserted eight claims: (1) against Officer John Harris, wrongful death under Colorado state law; (2) against the City of Lafayette on a respon-deat superior theory, wrongful death under Colorado state law; (3) against Harris and the City of Lafayette, violation of civil rights for Ryan’s death under 42 U.S.C. § 1983; (4) against the City of Lafayette on a failure to train theory, violation of civil rights for Ryan’s death under 42 U.S.C. § 1983; (5) against Harris and the City of Lafayette, violation of civil rights for Ryan’s death under 42 U.S.C. § 1983 for civil conspiracy; (6) against Harris and the City of Lafayette, violation of civil rights for use of excessive force under 42 U.S.C. § 1983; (7) against Harris, violation of civil rights for use of excessive force and lack of probable cause under 42 U.S.C. § 1983; and (8) against Taser International, Inc., product liability under Colorado state law. Wendy Wilson asserted six claims: (1) against all defendants,[1] except Taser International, wrongful death under 42 U.S.C. § 1983; (2) against all *782 defendants, except Taser International, deprivation of the rights of Wendy Wilson’s rights to a familial relationship with the decedent under 42 U.S.C. § 1983; (3) against Harris, battery under Colorado state law; (4) against all defendants, negligence under Colorado state law; (5) against Taser International and John Does, product liability based on negligence under Colorado state law; and (6) against Taser International and John Does, product liability based on strict liability under Colorado state law.
On September 24, 2007, the City of Lafayette and the Lafayette Police Department filed a motion to dismiss Wendy Wilson’s § 1983 claims against the Lafayette Police Department and her negligence claims against the city and the Lafayette Police Department. By this motion, the City of Lafayette and Lafayette Police Department sought to dismiss portions of Wendy Wilson’s claims one and two that were against the police department and the portions of her claim four that were against the city and the police department. Regarding the federal claims, the city and the police department argued that the police department is not a separate and distinct legal entity amenable to suit under 42 U.S.C. § 1983. Regarding the state law claims, they argued that the Colorado Governmental Immunity Act (CGIA), Colo. Rev.Stat. § 24-10-106(1), provides sovereign immunity for public entities (including the City of Lafayette and Lafayette Police Department) regarding all tort claims, including negligence, unless such immunity is expressly waived under the statute. A magistrate judge reviewed the motion and recommended that it be granted. The district court accepted the recommendation without opposition from either party. Wendy Wilson also eventually stipulated to dismissal of her second and fourth claims as against Police Chief Schultz.
The City of Lafayette also filed a motion to dismiss Jack Wilson’s second, third, and fifth claims as against the city. The City of Lafayette argued that the CGIA rendered it immune from suit on Jack Wilson’s second claim, and Jack Wilson agreed, voluntarily abandoning the claim against the city. The district court determined that the third claim, which Jack Wilson tried to base on an alleged due process violation, was really an excessive force claim that should have been based on the Fourth Amendment. This unnecessarily duplicated Jack Wilson’s other claims, and the court dismissed the claim as against the city. Finally, the district court dismissed the fifth claim as against the city based on its determination that the complaint failed to plead with specificity the necessary components of conspiracy. Shortly after the court issued its order, Jack Wilson voluntarily dismissed those same federal due process and conspiracy claims against Officer Harris.
Plaintiffs eventually stipulated to Taser International’s dismissal. Before Taser International was dismissed from the suit, however, Taser International filed a motion to exclude one of the plaintiffs’ experts, Dr. Kelly C. Lear-Kaul, from testifying about the taser’s role in Ryan death. The court granted the motion, determining that Dr. Lear-Kaul’s report that the taser could have caused Ryan’s death lacked “a specific and well-founded explanation of the manner in which a [taser] could have caused the cardiac arrhythmia.” App. E at 233.
Against the other defendants, the plaintiffs had several remaining claims. Jack Wilson and the estate had four remaining claims: (1) against Harris, wrongful death under Colorado state law; (2) against the City of Lafayette on a failure to train theory, violation of civil rights for Ryan’s death under 42 U.S.C. § 1983; (3) against *783 Harris and the City of Lafayette, violation of civil rights for use of excessive force under 42 U.S.C. § 1983; and (4) against Harris, violation of civil rights for lack of probable cause under 42 U.S.C. § 1983. Wendy Wilson had four remaining claims: (1) against the City of Lafayette, Harris, and Schultz, wrongful death under 42 U.S.C. § 1983; (2) against the City of Lafayette and Harris, deprivation of the rights of the plaintiff to a familial relationship with the decedent under 42 U.S.C. § 1983; (3) against Harris, battery under Colorado state law; and (4) against Harris, negligence under Colorado state law.
In the now appealed order, the district court dismissed all of these claims. First, the district court held Wendy Wilson could not bring a § 1983 wrongful death claim because she was not the representative of the estate. Next, it rejected Wendy Wilson’s § 1983 familial relationship claim, because Wendy Wilson made no showing that the defendants intended to deprive her of her familial relationship. Moving to Jack Wilson’s federal claims on behalf of the estate, the court concluded that Harris did not use excessive force in arresting Ryan Wilson, and, that even if he did, he was entitled to qualified immunity. The court then reasoned that, if the § 1983 claims against Harris failed, all of the other § 1983 claims must fail as well. The court also rejected Jack Wilson’s lack-of-probable-cause claim, finding that he had abandoned the claim and that there was adequate probable cause for Ryan Wilson’s arrest. Finally, the court considered the state law claims, and determined that they would fail as well, because they relied on an assumption that Harris’s actions in tas-ing Ryan Wilson were excessive.
On appeal, plaintiffs assert the district court erred in four ways: 1) the trial court erred in ruling that 42 U.S.C. § 1983 did not permit Wendy Wilson’s wrongful death cause of action; 2) in failing to view the facts in the light most favorable to the plaintiffs, and so erroneously holding that Harris was entitled to qualified immunity; 3) in dismissing the wrongful death claims under the Colorado Wrongful Death Act; and 4) in restricting Dr. Lear-Kaul’s causation testimony.
II
First, I address whether Wendy-Wilson had a cause of action for wrongful death under 42 U.S.C. § 1983. The district court held that 42 U.S.C. § 1983 does not recognize a wrongful death action brought by a third party. I would affirm this decision. Although we do allow for the recovery of some traditional wrongful death damages in an action under 42 U.S.C. § 1983, we do so only through the § 1983 cause of action brought by the decedent’s estate, and Wendy Wilson was not the representative of the estate.
In Berry v. City of Muskogee, 900 F.2d 1489 (10th Cir.1990), we held that the remedy in a § 1983 death case “should be a survival action, brought by the estate of the deceased victim, in accord with § 1983’s express statement that the liability is ‘to the party injured.’ ” Id. at 1506-07 (citing 42 U.S.C. § 1983).[2] In doing so, we first considered the possibility that we might instead borrow from state law— *784 there Oklahoma — as authorized by 42 U.S.C. § 1988. We refused to do so. And our reasoning appears to have foreclosed the argument made by Wendy Wilson that we might reach a different result when analyzing a different state’s wrongful death statute.[3]
In Berry we said:
The difficult question we face here is whether damages in a § 1988 action in which death occurs are limited to those recoverable under the Oklahoma survival action alone, or to those recoverable by such a survival action and an Oklahoma wrongful death suit, or whether damages are determined by some federal standard either as a survival or wrongful death-type action not defined or limited by state law.
900 F.2d at 1501. We first determined that limiting remedies to those available under some state survival statutes, such as Oklahoma’s, would overly limit recoveries and fail to provide a sufficient deterrent for civil rights violations. Id. at 1504. In deciding whether borrowing the Oklahoma wrongful death statute was an appropriate way to cure this deficiency, we noted that “[i]n considering whether the purposes of § 1983 are satisfied by adoption of state survival and wrongful death actions, we must consider that different states will define them differently, thus requiring individual analyses of each state’s law.” Id. at 1506. ‘We might then have to find that a state’s law works satisfactorily in some instances, as when there are surviving de-pendants, but not in other cases, as when there is no one with a right to sue.” Id. But we also said “[w]e must be careful in answering this question to avoid transgressing Moor [v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1773) ]’s prohibition of borrowing complete causes of action under the guise of vindicating rights under § 1983.” Id. at 1504. Further, turning over this remedy to state law would give states control over “the scope and extent of recovery” in addition to its allocation. Id. at 1506. This meant that in some states, like in Oklahoma, recovery would be diverted to parties named in the statute “to the exclusion of decedent’s creditors or the beneficiaries of the decedent’s will, if he or she has one.” Id. at 1506.
In light of these concerns, we decided to fashion a uniform, federal common law remedy that would incorporate some of the traditional common law recoveries in wrongful death suits. Id. at 1506-07. Our opinion spoke not to the deficiencies of a specific wrongful death statute, but rather about state statutes more broadly. In sum:
we conclude[d] that supplementing a state survival action with a state wrongful death action does not satisfy the criteria of § 1988 for borrowing state law. The laws are not suitable to carry out the full effects intended for § 1983 cases ending in death of the victim; they are deficient in some respects to punish the offenses. Application of state law, at least in some instances, will be inconsistent with the predominance of the federal interest.
Id. at 1506 (emphasis added).
Tellingly, we never actually analyzed the adequacy of the Oklahoma wrongful death *785 statute at issue in Berry. Wendy Wilson’s contention that the differences between the Oklahoma and Colorado wrongful death statutes would change our conclusion is predicated on a misreading of our opinion. We did not, as Wilson suggests, see Aplt. Br. at 22, express concerns about the limitations contained in both the Oklahoma survival and wrongful death statutes. We noted only the inadequacies of the Oklahoma survival statute. Indeed, we went on to state that the Oklahoma wrongful death statute “duplicated], in many respects, the recovery Mark Berry might have obtained had he lived to sue for his injuries” in addition to “permitting] recovery of the loss of consortium and grief of the surviving spouse, children, and parents, which Mark Berry could not have recovered had he had lived.” 900 F.2d at 1506. We never stated we found the Oklahoma wrongful death statute, as opposed to wrongful death statutes in other states, insufficient to accomplish the goals of § 1983. Thus, the fact that Colorado’s wrongful death statute may differ from the Oklahoma wrongful death statute at issue in Berry does not compel a contrary conclusion, and the district court correctly dismissed Wendy Wilson’s § 1988 claims brought on her own behalf against Officer Harris, Police Chief Schultz, and the City of Lafayette.
Ill
Next, I address Jack Wilson’s excessive force claims on behalf of Ryan Wilson’s estate. As stated above, I believe the majority failed to give proper weight to, as alleged, the egregious circumstances of this case. On this basis, I would reverse the district court’s decision to grant summary judgment for the defendants.
“This court reviews the grant of summary judgment de novo, applying the same standards as the district court.” Salazar v. Butterball, LLC, 644 F.3d 1130, 1136 (10th Cir.2011). “The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R.Civ.P. 56(a). “An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way,” and a dispute “of fact is material if under the substantive law it is essential to the proper disposition of the claim.” Thom v. Bristol-Myers Squibb Co., 353 F.3d 848, 851 (10th Cir. 2003) (quotations omitted).
Plaintiffs argue that the district court erred in determining that Harris used only justifiable force to seize Wilson. This issue arose based on Harris’s assertion of qualified immunity. When a defendant claims qualified immunity, the plaintiff bears the “heavy two-part burden” of showing (1) the defendant’s violation of a constitutional right; and (2) that the “infringed right at issue was clearly established at the time of the allegedly unlawful activity such that a reasonable law enforcement officer would have known that his or her challenged conduct was illegal.” Martinez v. Carr, 479 F.3d 1292, 1294-95 (10th Cir.2007) (quotation omitted). But “[e]ven though the plaintiff bears the burden of making this two-part showing [that defendant is not entitled to qualified immunity], we construe the facts in the light most favorable to the plaintiff as the nonmoving party.” Kaufman v. Higgs, 697 F.3d 1297, 1300 (10th Cir.2012) (quotation omitted).

a. The Facts

While the district court generally viewed the facts in the light most favorable to the plaintiffs, the district court appears to have erred with respect to Harris’s intent when tasing Ryan Wilson. The plaintiffs maintain that Harris either intentionally or *786 recklessly shot Ryan Wilson in the back of the head with the taser. Although Harris argues he aimed for the “center mass,” the taser is equipped with a laser targeting system and he fired from just ten to fifteen feet away. Regardless of Harris’s offered explanations as to why his action was not reckless, we must at summary judgement view the facts in the light most favorable,to the Wilsons. Under this factual scenario, a jury could reasonably infer that Harris intentionally or recklessly shot Ryan Wilson in the head with the taser.

b. As Alleged, Hams Shooting Wilson in Head with Taser Constituted Unconstitutional Use of Excessive Force

Although not necessary to its opinion, the majority expresses skepticism that Harris’s use of the taser would even reach the level of a constitutional violation. It reached this conclusion after analyzing the defendant’s conduct under Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). But the factors the majority analyzes are not exclusive. Graham requires looking at all circumstances, including the nature of the alleged Fourth Amendment intrusion. Id. at 396, 109 S.Ct. 1865. The majority’s analysis gives scant attention to the, as alleged, egregious conduct of Officer Harris — a intentional or reckless shot to the head with a taser with a targeting function and from merely ten to fifteen feet away.
As the majority points out, Graham “requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Id. And it is true, that at best, these factors are mixed. Harris knew that Ryan Wilson was suspected of illegally growing marijuana, and we have held that similar felony crimes are severe crimes. Smith v. Wampler, 108 Fed.Appx. 560, 565 (10th Cir.2004) (unpublished) (noting that drug possession and distribution constitute severe criminal activity). In addition, Wilson was attempting to evade arrest by flight. These factors both favor Harris.
But taking the facts in the best light for the plaintiffs, it is not clear Harris could have reasonably believed that Ryan Wilson posed an immediate danger to himself or to the other officers. There appears to be significant dispute as to what actually happened prior to the time Harris fired. At worst, Harris believed that Ryan was carrying a knife small enough to fit in his pocket. But Harris admitted he never saw the knife leave Ryan Wilson’s pocket. And Ryan Wilson, based on the alleged location of the taser shots, was turned or turning away from Harris at the time Harris fired the taser.
Further, even if those factors favor Harris, the ultimate question is “whether the officers’ actions are objectively reasonable in light of the facts and circumstances confronting them without regard to their underlying intent or motivation.” Graham, 490 U.S. at 397, 109 S.Ct. 1865 (quotations omitted). When analyzing these cases, we undertake a “careful balancing of the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the countervailing governmental interests at stake.” Id. at 396, 109 S.Ct. 1865 (quotations omitted). The majority gives little attention to the nature of the force used. In Cavanaugh v. Woods Cross City, we noted that a taser “sends up to 50,000 volts of electricity through a person’s body, causing temporary paralysis and excruciating pain,” making the “nature and quality of the intrusion into the interests of [the person] protected by the *787 Fourth Amendment ... quite severe.” 625 F.3d 661, 665 (10th Cir.2010) (quotations omitted). Even if Ryan Wilson’s conduct here was more culpable than in the taser cases cited by the majority, an intentional or reckless taser shot to the head seems to merit an even higher burden for a government actor to justify his use of force.
In the present case, it would be unreasonable for an officer to fire a taser probe at Ryan Wilson’s head when he could have just as easily fired the probe into his back. The taser training materials note that officers should not aim at the head or throat unless the situation dictates a higher level of injury risk.[4] Nothing about the situation here required an elevated level of force. All Harris was attempting to do was subdue a fleeing suspect.
Likewise, we have held that “it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force — or a verbal command — could not exact compliance.” Casey v. City of Fed. Heights, 509 F.3d 1278, 1286 (10th Cir.2007) (citing Hinton v. City of Elwood, 997 F.2d 774, 776-77, 781 (10th Cir.1993) (holding it was not excessive force for officers to use an “electrical stun gun” on a man, who after shoving an officer, was wrestled to the ground and then proceeded to kick and bite officers)). Extending this logic, it is excessive to use a taser shot to the head when there is no reason to believe that a taser shot to the body would not exact compliance. Because there is no evidence that tasing Ryan Wilson in the body would not have sufficed, tasing him in the head, if intentional or reckless, was an unreasonable use of force in affecting the arrest. Thus, viewing the evidence in the light most favorable to the plaintiffs, Harris violated Ryan Wilson’s Fourth Amendment right to be free from an unreasonable seizure.
The majority mischaracterizes my argument when it suggests that considering Harris’s intent to hit Ryan Wilson in the head impermissibly looks at subjective intent as part of the Graham analysis. Graham’s requirement that courts should view excessive force claims “without regard to their underlying intent or motivation” clearly aims to prohibit the use of a good or bad faith analysis. Graham, 490 U.S. at 397, 109 S.Ct. 1865 (“An officer’s evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer’s good intentions make an objectively unreasonable use of force constituional.”). To say Harris “intentionally” shot Ryan Wilson in the head is not to say he acted in bad faith, but rather to say he chose to aim for Ryan Wilson’s head, just as an officer “intentionally” chooses to use a taser to stop the defendant instead of tackling him. An objective, totality of the circumstances analysis requires us to consider that this is a different “nature of force” used than in the taser cases cited by the majority.
Further, it is not readily apparent why, assuming this discussion of intent is barred by Graham, our analysis would not need to consider the plaintiffs’ allegation that Ryan Wilson was shot in the head. If anything, a discussion of intent only helps Harris, as there may be, as the majority points out, mitigating factors making his allegedly inaccurate shot reasonable. That is, if the court cannot consider Harris’s excuses in its objective inquiry, it must, at the summary judgment stage, accept the *788 allegation the taser hit Ryan Wilson in the head — a more excessive use of force than seen in our other taser cases — and analyze accordingly. If not, it follows from the majority’s reasoning that it matters only what weapon an officer uses and not how he uses it. I am not sure how to square that with a totality of the circumstances analysis, if it can be squared at all.
In addition, the defendants’ citation to the unpublished Fifth Circuit case of Batiste v. Theriot, 458 Fed.Appx. 351 (5th Cir.2012) is inapposite. The Fifth Circuit there held there was no excessive use of force despite a taser shot to the head. But the autopsy determined the victim died, hours after being tased, as a result of “multidrug intoxication” and “neither the medical expert who performed the autopsy, nor [plaintiffs’] own expert, testified that [his] injuries were the direct result of the tasing.” Id. at 353, 355. The court concluded “[t]he injury did not result from the tasing regardless of its reasonableness,” meaning the tasing could not serve as the basis of an excessive force claim. Id. at 355. Here, Ryan Wilson died shortly after being tased, and the tasing remains a possible cause of death. Further, Batiste did not discuss the distance at which the taser was fired, the taser’s targeting system, or whether the training manual warned against shots to the head. It is thus unpersuasive.
c. This Right was ■ “Clearly Established”
Identifying a constitutional violation, of course, does not end our inquiry. In order to hold an officer liable, the plaintiff must also show the law was clearly established. This right appears to be clearly established such that Harris had no legitimate justification for intentionally or recklessly shooting Ryan Wilson in the head. As alleged, Officer Harris’s conduct was sufficiently egregious that the lack of perfectly analogous taser cases at the time of Ryan Wilson’s death should not shield Harris from suit.
“We cannot find qualified immunity wherever we have a new fact pattern.” Casey, 509 F.3d at 1284. The Supreme Court has “shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional.” Gomes v. Wood, 451 F.3d 1122, 1134 (10th Cir.2006) (quotation omitted). “[A] general constitutional rule that has already been established can apply with obvious clarity to the specific conduct in question, even though [such conduct] has not previously been held unlawful.” Anderson v. Blake, 469 F.3d 910, 914 (10th Cir.2006) (quotation and alteration omitted).
“The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.” Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir.2004). If a jury were to conclude that Harris intentionally or recklessly shot Ryan Wilson in the head with the taser, his conduct would be egregious. And, as we have said, “an officer’s violation of the Graham reasonableness test is a violation of clearly established law if there are no substantial grounds for a reasonable officer to conclude that there was legitimate justification for acting as she did.” Casey, 509 F.3d at 1286 (quotation omitted). See also Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1196 (10th Cir.2001) (“It is also clearly established that police use of less than deadly force in seizing and detaining a person, particularly a bystander not suspected of wrongdoing, must be justified under all of the circumstances.”). True, *789 Ryan Wilson was a fleeing suspect, not an innocent bystander. But, as stated above, aiming at or recklessly hitting Ryan Wilson’s head was not justified under the circumstances. And a reasonable officer would know that aiming or recklessly tas-ing Ryan Wilson in the head under the circumstances presented was unconstitutional.
The majority makes much of the fact that the plaintiffs failed to cite a taser case decided prior to 2006 that holds this particular use of a taser constitutes excessive force. But we did not cite to any ease holding the use of a taser excessive when we denied qualified immunity to one of the defendants in Casey; the best we could say was that no circuit had upheld the use of a taser in those circumstances. Casey, 509 F.3d at 1286. The violation of Graham, along with an absence of “legitimate justification” for the officer’s actions, was enough for the plaintiff to survive the defendant’s assertion of qualified immunity. Id. (“On the summary judgment record— which of course may be disputed at trial— Officer Lor’s use of the [tjaser was without any legitimate justification in light of Graham.”).Given the egregious nature of Officer Harris’s action and lack of a reasonable or legitimate justification for using excessive force, I similarly do not believe the absence of a perfectly analogous taser case dooms Jack Wilson’s § 1983 claim on behalf of the estate in this case. Thus, I would hold that the district court erred by granting Harris qualified immunity.

d. Claims Against Other Defendants

Because the district court granted Harris qualified immunity, the district court also rejected Jack Wilson’s related § 1983 claims for the estate against the City of Lafayette. Because I would reverse with respect to Harris’s qualified immunity, I would also reverse with respect to these claims. Although the City of Lafayette offers additional arguments as to why it should be granted summary judgment, the district court has yet to address these arguments. Where an issue has been raised before the district court, but not ruled on, we generally favor remand for the district court to examine the issue in the first instance. See Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (“It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.”); In re R. Eric Peterson Constr. Co., 951 F.2d 1175, 1182 (10th Cir.1991) (“The district court never reached this issue .... We therefore remand this issue to the district court.”). Given the fact-intensive nature of this inquiry and the lack of briefing on these issues from the plaintiffs, I would remand these issues to the district court.
Similarly, I would remand the state law claims under the Colorado wrongful death statute to the district court. The court based its grant of summary judgment on these claims on its conclusion that Officer Harris’s actions were objectively reasonable. As I disagree, it would create the possibility of reviving these claims. I would also leave for the district court to address in the first instance the defendants’ other arguments in response to the state law claims.
IV
Because I would not dismiss the case on summary judgment, I would proceed to consider the evidentiary issue raised by the plaintiffs. They challenge the district court’s decision to limit the testimony of Dr. Kelly C. Lear-Kaul on the issue of causation. “We review de novo the question of whether the district court employed the proper legal standard and performed its gatekeeper role in admitting expert testimony but review for abuse of discretion the court’s actual application of this *790 standard in deciding whether to admit or exclude an expert’s testimony.” United States v. Abdush-Shakur, 465 F.3d 458, 466 (10th Cir.2006) (quotation omitted). “A district court abuses its discretion when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment.” Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 968 (10th Cir.2001) (quotations omitted).
The plaintiffs have failed to establish that the district court abused its discretion as regards this evidentiary ruling. Simply because another district court would not abuse its discretion by admitting this testimony does not mean a district court abuses its discretion by excluding it. See, e.g., N. Am. Specialty Ins. Co. v. Britt Paulk Ins. Agency, Inc., 579 F.3d 1106, 1112 (10th Cir.2009) (“[T]hat the district court [in one case] did not abuse its discretion by allowing expert testimony by an insurance industry expert does not lend measurable support to the contrary position that the district court in this case abused its discretion by refusing to permit similar testimony.”). Although I would likely have admitted the testimony if I were ruling from the trial bench, the plaintiffs must under the abuse of discretion standard show that the district court’s decision “exceeded the bounds of the rationally available choices given the facts and the applicable law in the case at hand.” Big Sky Network Can., Ltd. v. Sichuan Provincial Gov’t, 533 F.3d 1183, 1186 (10th Cir.2008). The arguments made by the plaintiffs cannot meet this burden. Thus, I would affirm the district court’s decision to limit Dr. Lear-Kaul’s testimony. To the extent the plaintiffs worried the doctor’s inability to testify as to causation might mislead the jury, the plaintiffs would have the option of not offering her testimony at all.
V
Accordingly, I would affirm in part, reverse in part, and remand.

. Wendy Wilson initially filed suit against the City of Lafayette, the Lafayette Police Department, Harris, Police Chief Paul Schultz, TA-SER International, and John Does 1-5. App. A at 142.

. Wendy Wilson supports her argument by citing Cossio v. City & Cnty. of Denver, Colo., 986 F.Supp. 1340, 1344-45 (D.Colo.1997), and Sager v. City of Woodland Park, 543 F.Supp. 282, 288 (D.Colo.1982). Both of these cases appeared to permit incorporation of state wrongful death statutes into § 1983 through § 1988, but our holding in Berry forecloses this option. Sager was decided before we published Berry, and Cossio, which does not cite Berry, appears to be wrongly decided (and, in any case, was dismissed on the merits).

. I note, however, that our holding now conflicts with the law in Sixth Circuit, whose earlier precedent, Jaco v. Bloechle, 739 F.2d 239 (6th Cir.1984), we relied on in Berry. See Frontier Ins. Co. v. Blaty, 454 F.3d 590, 603 (6th Cir.2006) ("We believe section 1988's instruction to set aside a state remedy should only be used where it provides no meaningful deterrence, such as when that remedy provides no recovery for an otherwise valid plaintiff. This Court should not disturb a state remedy unless it is clear that such remedy is wholly inconsistent with the Constitution and the goals of section 1983.”).

. Specifically, the manual warns: “DO NOT AIM AT HEAD/THROAT UNLESS SITUATION DICTATES A HIGHER LEVEL OF INJURY RISK IS JUSTIFIED. Hits in these areas are effective, but probes in the eyes and throat can cause serious injuries.” App. D at 397.